Max RASKIN, Plaintiff-Appellant,

Robert H. Gollmar,
Intervening-Plaintiff-Appellant,

v.

J. Dennis MORAN, Ken Timpel, and
Charles P. Smith,
Defendants-Appellees.

No. 81–1161.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 11, 1981.

Decided July 9, 1982.

Mark M. Camp, Pfannerstill & Camp, Wauwatosa, Wis., for plaintiff-appellant.

Warren M. Schmidt, Dept. of Justice, Madison, Wis., for defendants-appellees.

Before PELL and CUDAHY, Circuit Judges, and GRANT,* Senior District Judge.

CUDAHY, Circuit Judge.

Plaintiffs Max Raskin and Robert H. Gollmar appeal from an order dismissing their complaint and upholding the constitutionality of a Wisconsin statute which reduces the salary of certain "reserve" judges by an amount equal to any federal social security benefits received by these judges. On this appeal, plaintiff judges argue that the Wisconsin statute is void under the supremacy clause because it conflicts with federal law, that the state law impermissibly deprives them of property without just compensation in violation of due process and that the statute violates the equal protection clause by treating the judges differently from other state employees. We reverse the judgment below because we find that the Wisconsin statute impermissibly conflicts with federal law governing plaintiffs' right to social security benefits.

## I.

Since his mandatory retirement at age 70 as a circuit judge in 1973, Max Raskin has continued to serve in various capacities as a trial court judge in Wisconsin. In 1977, the Wisconsin legislature enacted the statute in issue here which established the offices of "permanent reserve judge" and "temporary reserve judge."[1] On August 1, 1978, Raskin was appointed a permanent reserve judge of the Circuit Court of Waukesha County. Raskin had acted as a reserve judge of this court under a predecessor statute since October, 1977, and, after his 1978 appointment, he served as a permanent reserve judge until December 9, 1980. Since that time, Raskin has served as a "temporary reserve judge" of the circuit court on a day-to-day basis. He expects to be reappointed as a permanent reserve judge if another vacancy arises.

During the pendency of this appeal, Robert H. Gollmar petitioned to intervene as a party plaintiff. Gollmar is also a retired Wisconsin judge who is currently acting as a permanent reserve judge in Walworth County. Both Raskin and Gollmar are eligible to receive federal old-age benefits under the Social Security Act (the "SSA" or the "Act").

Defendants are officials of the Office of the Director of State Courts, who are charged with managing the financial and administrative affairs of the Wisconsin court system, as well as the State Treasurer. Pursuant to the directive of state law,

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is *sitting by designation.*

1. This statute provides:
   (a) "Permanent reserve judge" means a judge appointed by the chief justice to serve an assignment for a period of 6 months. Permanent reserve judges shall perform the same duties as other judges and may be reappointed for subsequent periods.
   (b) "Temporary reserve judge" means a judge appointed by the chief justice to serve such specified duties on a day-to-day basis as the chief justice may direct.
   *Wis.Stat.* § 753.075(1)(a)–(b) (1979).

the defendants have deducted from the compensation payable to plaintiffs as permanent reserve judges an amount equal to the federal social security benefits received by the plaintiffs. The statutory provision authorizing this deduction states:

> (b) Permanent reserve judges shall receive compensation equal to the compensation for the 6-month period of a judge of the court to which they are assigned.... This compensation is not subject to s. 41.11(12) or subch. IX of ch. 40 *but the combined amount of this compensation and any other judicial compensation together with* retirement annuities under the Wisconsin retirement fund, the Milwaukee county retirement fund or other state, county, municipal or other Wisconsin governmental retirement funds *or social security received by him or her during any one calendar month shall not exceed one-twelfth of the yearly compensation of a circuit judge,* including any county supplements paid as provided in ss. 753.016(2) and 753.071. Permanent reserve judges shall receive health insurance calculated under s. 40.14 of 40.–145 and s. 40.16 and vacation benefits calculated under s. 230.35(1). Except for county supplements, compensation for permanent reserve judges shall be paid from the appropriation under s. 20.625(1)(b).

*Wis.Stat.* § 753.075(3)(b) (1979) (emphasis supplied).[2] This statutory provision, together with its counterpart in *Wis.Stat.* § 753.075(3)(a) (1979) applicable to temporary reserve judges, are challenged by plaintiffs here seeking declaratory and injunctive relief.

On December 30, 1980, the district court granted defendants' motion to dismiss the complaint for failure to state a claim upon which relief could be granted. The court concluded that the Wisconsin statute neither impaired Raskin's right to receive social security nor conflicted with the federal statute which allows a recipient, at and after age 72, to receive social security benefits without any deduction for income earned. The district court also rejected plaintiffs' due process claim, holding that the "right" to social security benefits did not constitute a property interest protected by the fourteenth amendment. Finally, the court found that any difference in treatment of the class of permanent reserve judges and other non-retired, non-permanent judges, including disabled judges, was rationally related to legitimate Wisconsin policy goals.

## II.

Plaintiffs' supremacy clause[3] argument is premised upon section 203(f)(3) of the SSA. That section now provides, *inter alia*, that in applying what is commonly known as the "retirement test" to reduce a social security recipient's benefits on account of specified earned income, any income earned after the recipient's 70th birthday will not be used to reduce benefits. *See* 42 U.S.C.A. § 403(f)(3) (Supp.1981).[4] The effect of this provision is that social security recipients will not suffer offset of their earnings against their benefits after they reach the age of 70. Recipients under age 70, however, are subject to the "retirement test" provisions of section 203, which reduce ben-

---

2. As noted, Raskin's appointment to the post of permanent reserve judge expired in December, 1980, and he now serves as a temporary reserve judge. Defendants are authorized under *Wis.Stat.* § 753.075(3)(a) (1979) to continue to offset against his compensation as a temporary reserve judge sums equal to the amount of social security benefits he receives.

3. The supremacy clause, *U.S.Const.*, art. VI, cl. 2, declares that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ...."

4. At the time of the litigation before the district court, section 203(f)(3) of the SSA recognized age 72 as the operative age for eliminating the retirement test. Congress amended this provision in 1977 to provide that, in the taxable years after December 31, 1981, the age level for escaping the retirement test would be reduced to 70 years. Social Security Act Amendments of 1977, P.L. No. 95–216, § 302, 91 Stat. 1509, 1531. Throughout this litigation, both plaintiffs were 72 years old or more and, thus, would benefit from the elimination of the retirement test under either the old or the new provisions.

efits by one dollar for every two dollars of earned income above a statutorily exempt amount. *See* 42 U.S.C.A. §§ 403(f)(1), (8) (Supp.1981). As additional support for their preemption argument, plaintiffs cite section 207 of the SSA, 42 U.S.C. § 407 (1976). Section 207 prohibits the execution, levy, attachment or garnishment of social security benefits.

Plaintiffs' preemption argument, reduced to its essentials, is that federal policy prohibits any reduction in the social security benefits of persons over age 70 who continue to earn income, and that this prohibition extends to admittedly indirect reductions such as those effectuated here by Wisconsin. According to plaintiffs, it is irrelevant that Wisconsin does not directly take away plaintiffs' social security benefits because Wisconsin achieves the same result by deducting an equivalent amount from their state salaries. Plaintiffs contend that after age 70, they may work for Wisconsin as judges, receive state salaries for this employment and also receive their full social security benefits under the protection of federal law. Although Wisconsin does not force plaintiffs to give up or assign their federal benefit checks, Wisconsin has reduced their total income by an amount exactly equal to their federal benefit checks through a setoff against their state salaries. Plaintiffs thus urge this court to recognize economic reality rather than to focus on the technical question whether Wisconsin *directly* impedes their receipt of federal social security benefits.

■ "The question whether federal law 'preempts' state action, largely one of statutory construction, cannot be reduced to general formulas." *L. Tribe, American Constitutional Law* 377 (1978). Nonetheless, the Court has articulated several principles we find instructive for interpreting the supremacy clause. As a starting point, the Court has said that when determining whether state law conflicts with a federal law, "[t]he purpose of Congress is the ultimate touchstone." *Retail Clerks, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). It is also important to recognize that plaintiffs claim that Wisconsin law is preempted here not because Congress intended to fully occupy the field of welfare-related benefit regulations but rather because Wisconsin law interferes with or contradicts federal policy. Although state law exercising a state's traditional police powers is not preempted on account of interference with federal law or policy "unless that was the clear and manifest purpose of Congress," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), we are obliged by the supremacy clause to strike down state laws which "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *cf. Ridgway v. Ridgway*, 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981) (even in area of state family law, supremacy clause prevents "frustration and erosion" of federal rights). Moreover, "the relative importance to the State of its own law is not material when there is a conflict with a valid federal law . . . ." *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962). Even if "the state legislature in passing its law had some purpose in mind other than one of frustration," we must still strike down the state law if it actually impedes the operation of the federal statute. *Perez v. Campbell*, 402 U.S. 637, 651–52, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971).

We must therefore begin what "is essentially a two-step process of first ascertaining the construction of the two statutes and then determining whether they are in conflict." *Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971). As indicated, section 203(f)(3) eliminates the retirement test for individuals above age 70 so that earned income may not be counted to reduce social security benefits. Congress in 1950 initially legislated an age limitation for application of the retirement test when it established age 75 as the cutoff point for applying the test. Social Security Act Amendments of 1950, § 103(e), Pub.L.No. 81–734, 64 Stat. 477, 490. This age thresh-

old was lowered to 72 in 1954.[5] Social Security Act Amendments of 1954, § 103(b), 68 Stat. 1052, 1073. When enacting the 1950 age limitation, Congress briefly explained its purpose:

> There would be no limit upon the earnings of insured persons age 75 and over, or of their dependents age 75 and over, since comparatively few persons continue to work regularly at substantial wages after that age. This provision has particular significance for self-employed persons and others engaged in occupations in which retirement is customarily deferred to an advanced age.

S.Rep.No. 1669, 81st Cong., 2d Sess., *reprinted in* 1950 U.S.Code Cong. & Ad.News 3287, 3318. Congress shed more light on the purpose of the provision at the time of the 1954 amendment:

> Under present law, persons age 75 and over are exempted from the retirement test primarily as a means of assuring some return on contributions for people who continue working to a very advanced

age and who would otherwise draw very little, if any, payment under the system. The committee bill would lower the exempt age from 75 to 72.

S.Rep.No. 1987, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad.News 3710, 3727.

Section 203(f)(3), together with the pertinent statements of legislative history, indicates that Congress eliminated the retirement test recognizing that some persons, who are able to work past normal retirement age, would otherwise receive no return on their social security "investment."[6] The federal policy evident from this statute is that persons over age 70 should receive the full federal benefit regardless of the source or amount of other income earned by the recipient. Although the SSA does not expressly preclude the application of state law which might incidentally affect some aspect of social security, we have no doubt that a state statute which effectively denies benefits conferred by section 203 would be suspect under the supremacy clause.[7]

---

5. In 1977, the House proposed, as part of the SSA amendments then under consideration, to reduce the age for the retirement test exemption from 72 to 65. The bill reported by the Senate, however, reduced that age from 72 to 70. The House acceded to the Senate's action. *See* H.R.Rep.No. 702, 95th Cong., 1st Sess. 68 (Part II), *reprinted in* 1977 U.S.Code Cong. & Ad.News 4155, 4262–63.

6. Congress' broad purpose in establishing old-age benefits as part of the social security system was to create a public social insurance program which would protect aged workers and their dependents from loss of income. *See Mathews v. De Castro*, 429 U.S. 181 (1976); *Rosenberg v. Richardson*, 538 F.2d 487 (2d Cir. 1976). Although the social insurance aspects of the social security program tend to predominate, certain provisions in the program reveal other factors which have influenced the development of the social security system. For example, the progressive benefit structure in the program reveals, to a certain degree, the influence of a welfare orientation. On the other hand, section 203(f)(3)'s elimination of the retirement test distinctly emphasizes the insurance aspect of the social security system. These different—and often competing—influences create difficulty for the courts in accurately and fairly interpreting the intent of Congress. *See generally* Martin, *Public Assurance of an Adequate Income in Old Age: The Erratic Partnership Between Social Insurance and Pub-*

*lic Assistance*, 64 *Cornell L.Rev.* 437 (1979). This difficulty becomes evident in a supremacy clause challenge to a state law purporting to regulate an area wholly within state control—such as the instant case.

7. We believe that plaintiffs' reliance on section 207 of the Act, 42 U.S.C. § 407 (1976), is misplaced. It is evident that section 207, on its face, protects social security benefits against direct attachment, garnishment, assignment or levy. *See, e.g., Tidwell v. Schweiker*, 677 F.2d 560 (7th Cir. 1982); *Neavear v. Schweiker*, 674 F.2d 1201 (7th Cir. 1982). Our research has disclosed no case where a court has either upheld or invalidated under section 207 a salary setoff scheme similar to the one at issue here. The Supreme Court's only decision construing section 207—*Philpott v. Essex County Welfare Board*, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973)—is not to the contrary. In *Philpott*, a state filed a lawsuit seeking to attach a welfare recipient's bank account which contained sums paid to the recipient under the federal social security program. The state claimed a legal right to these sums by virtue of a state statute which authorized the state to setoff from the recipient's state welfare payments a sum equal to any federal social security benefits received by the recipient. The Court held that the action taken by the state to recover monies owed to it under the state statute—the lawsuit seeking an attachment—was

In construing the Wisconsin statute, we note as a preliminary matter that *Wis.Stat.* § 753.075(3) focuses on regulating the total income to be received as compensation or retirement benefits by reserve judges. The statute then seeks to control total income by regulating salaries. It is undeniable, however, that in the process of regulating plaintiffs' judicial salaries, Wisconsin has reduced what plaintiffs' salary would otherwise be (in the absence of the relevant provisions of section 753.075) by an amount precisely equal to their federal social security benefits. *See* Plaintiffs'-Appellants' Brief, exs. E & F. Defendants advance two purposes for this reduction. First, Wisconsin desires to place both permanent and temporary reserve judges on an equal footing in terms of income (both earned and retirement) with the nonreserve judges whom they replace. Reserve judges thus not only exercise the same powers as the judges they replace but also receive the same total income (earned and retirement) as that normally paid by the state to those active judges. Second, Wisconsin has expressed a strong policy against the practice of "double dipping" by state employees. *See* 1979 Wis.Laws, ch. 38, § 1 (statement of legislative purposes preceding amendments to *Wis.Stat.* §§ 40.90–.96 (1979)). The state apparently believes its best interests are promoted by not paying full salaries to public officials who are simultaneously receiving other public benefits, regardless of the source or purpose of those benefits.[8]

Having ascertained the construction of the two statutes, we proceed to the second prong of the *Perez v. Campbell* test of preemption, *i.e.,* determining whether there is an actual conflict between the state and federal statutes. We are, of course, mindful that a mere inconsistency between the state and federal statutes is not sufficient to invoke the bar of the supremacy clause; the state statute must "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" before we are authorized to invalidate it as repugnant to the Constitution. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581.

We are convinced that even under this very demanding standard, the Wisconsin statute at issue here is invalid. Although not *directly* preventing or impeding plaintiffs' receipt of social security benefits, Wisconsin effectively deprives the recipient of those federal benefits by reducing plaintiffs' salaries in an amount precisely equal to the federal benefits. Indeed, we would put form over substance if we held that only direct efforts to reduce, divert or eliminate social security benefits were in conflict with section 203(f)(3).[9] *Cf. Toll v. Moreno,*

specifically barred by section 207. In reaching this conclusion, the Court declined to pass on the question of the general validity of the state statute authorizing the setoff. Instead the Court felt that the unlawful aspect of the state's action was the lawsuit, which was not specifically authorized by the federal statute. Thus we are unwilling to accept plaintiffs' argument that section 207, at least as interpreted by the *Philpott* Court, is another independent ground for invalidating the Wisconsin statute here since the *Philpott* Court's decision is limited to a situation involving direct attachment or garnishment by a state, which is not found in the instant case. In addition, the *Philpott* Court's failure to reach the question whether a state setoff scheme is valid under section 207 erodes plaintiffs' reliance on that decision.

**8.** Although the purpose underlying the state statute is not controlling in a supremacy clause analysis, *see Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), this as-

serted justification for the Wisconsin statute is a matter of concern to us. Whatever validity may attach to Wisconsin's desire to prevent "double dipping" by its employees, such as a need to protect the public fisc or prevent the appearance of impropriety, is vitiated when *federal* benefits are involved. The asserted rationale of restraining "double dipping" actually contributes, in our view, to the conclusion that the Wisconsin statute frustrates federal policy. State law and policy are directed specifically against the recipients of federal social security benefits and an amount exactly equivalent to those benefits is required to be deducted by state law. *See also Toll v. Moreno,* —— U.S. ——, ——, 102 S.Ct. 2977, 2985, 73 L.Ed.2d 563 (1982).

**9.** In apparent recognition of the effect of its social security setoff, Wisconsin notes that "[a]s a trade-off, ... permanent reserve judges are exempted from the provisions of sec. 41.-

—— U.S. ——, ——, 102 S.Ct. 2977, 2985, 73 L.Ed.2d 563 (1982) (held, state could not recoup indirectly from G–4 visaholders taxes which federal government bars state from directly collecting from this class of aliens, by denying in-state resident status for tuition purposes to these aliens). Here, by the indirect method of setoff, which as a matter of elementary arithmetic penalizes in the exact amount of his social security payments the social security recipient who both works and lawfully receives benefits, there is an inescapable conflict with section 203(f)(3) of the SSA.[10] The federal policy of paying persons over age 70 their full social security benefit is effectively thwarted by this state salary deduction scheme. Moreover, the interference with federal policy here is not merely an incidental effect of the state statute. While pleading its concern with "double dipping," Wisconsin must concede that it is directly regulating judicial salaries based upon, *inter alia*, the receipt of federal benefits. But where Congress has, by eliminating the retirement test for persons over age 70, made concrete and specific a federal policy against "integration" of social security benefits and salaries, we cannot allow Wisconsin to achieve integration of plaintiffs' state salaries and federal old age benefits through the device of the salary setoff.[11]

The state contends that plaintiffs essentially argue that Congress intended to insure that older social security recipients could "earn as much as possible" and still receive their social security benefits. The district court also ascribed such an argument to the plaintiffs and specifically rejected it. But, whether or not this characterization of congressional intent is accu-

---

11(12), Wis.Stats." Defendants'-Appellants' Brief at 6. Section 41.11(12)(a) provides, *inter alia*, that the annuity paid under the Wisconsin Retirement Fund (WRF) will be terminated for persons over age 60 who resume public employment and earn in excess of one-half of their former annual earnings; under *Wis.Stat.* § 753.075(3)(b) (1979), permanent reserve judges are exempted from the WRF termination provision. But the defendants have not provided us with any citation to legislative or judicial interpretations of these statutory provisions indicating that the Wisconsin legislature intended the WRF exclusion to counter-balance the effects of the social security setoff. Moreover, even if defendants have accurately characterized the purpose of the WRF exclusion for reserve judges, that interpretation does not address the supremacy clause issue presented here since Wisconsin's social security setoff still conflicts with section 203(f)(3) of the SSA. Finally, it is possible that Wisconsin has, albeit impliedly, recognized the same interests involved in the federal exemption from the social security retirement test (particularly the interest in permitting individuals who pay into the system to receive at some point some return on their "investment") by allowing reserve judges to receive the retirement annuities they contributed to as state employees.

10. It may be argued that Wisconsin could, under the supremacy clause, establish a lower rate of pay for reserve judges with the knowledge that additional federal social security benefits would increase the reserve judges' total income to the level of non-reserve judges and thereby achieve the same general result as *Wis. Stat.* § 753.075. That may be so, especially since we have no occasion to pass on the general validity of Wisconsin's judicial salary levels. But Wisconsin has chosen to reduce each reserve judge's salary by an amount *exactly equivalent to his federal social security benefits* rather than to pay reserve judges a lower salary in more general recognition of social security and other retirement benefits they might receive. Even though we do not in most cases quarrel with the means chosen by states to regulate matters within their plenary powers, see *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1129, 67 L.Ed.2d 258 (1981), those means are not immune from supremacy clause analysis when they are specifically directed at offsetting the exact equivalent of the social security benefits.

11. In contrast, Congress expressly allowed integration of social security benefits with *private pension* benefits under section 204 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1054(b)(1)(B), (C) & (G) (Supp. III 1979). *See Allessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 514–17, 101 S.Ct. 1895, 1901–1903, 68 L.Ed.2d 402 (1981). For this purpose, pension benefits are inherently different from salaries for full-time employment. Moreover, integration of plaintiffs' social security benefits and their state salaries is, standing alone, inconsistent with the design and intent of the federal retirement test exclusion for recipients over age 70. Thus, in the absence of specific congressional approval of integration, such as in ERISA, we may not permit a state statutory scheme that operates in quite effective and well-focused contravention of the policy of section 203 of the SSA.

rate, we think the present facts do present a clear frustration of the policy incorporated in section 203(f)(3) of the SSA. In any event, plaintiffs do not specifically contend they are entitled to "earn as much as possible" but merely that they should receive a regularly established state salary without setoff for federal social security benefits. This setoff is the financial equivalent of not receiving their social security benefits and, therefore, frustrates the will of Congress.[12]

We also note that the federal policy here may not be especially crucial or strongly propounded by Congress.[13] It is arguable that the state policy, on the other hand, may be strongly held and strongly propounded by Wisconsin. But we do not see it as our function to weigh or balance the force of the federal policy against that of the state. *Cf. Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962) (state statutory purpose not significant in supremacy clause analysis). The supremacy clause itself clearly resolves that conflict in favor of the federal law. *See McCulloch v. Maryland,* 4 Wheat. 316, 436, 4 L.Ed. 579 (1819).

In reaching the conclusion that *Wis.Stat.* § 753.075 is preempted by section 203(f)(3) of the SSA, we find guidance in several Supreme Court decisions. For example, in *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), the Court struck down an Arizona statute that conflicted with section 17 of the Bankruptcy Act of 1898, 11 U.S.C. § 35 (1976) (repealed). Section 17 provided that a dis-charge in bankruptcy discharges all but certain specified judgments. The conflicting Arizona statute provided that the state would not recognize a discharge in bankruptcy of an automobile accident tort judgment in that, if the debtor-driver did not pay the judgment, the state would withhold driving privileges.

It was undisputed in *Perez* that Arizona generally possesses plenary authority to regulate the drivers of automobiles on its highways (just as Wisconsin, in the instant case, possesses plenary authority to regulate judges' salaries) and that insuring the financial responsibility of such drivers was a legitimate state policy undergirding the state statute. But meritorious and important purposes alone were insufficient to save the Arizona statute from federal preemption when the effect of the state statute was to frustrate the federal statute's protection of debtors discharged in bankruptcy. Similarly in the instant case, the Wisconsin statute frustrates another federal protective provision—section 203(f)(3)'s elimination of the retirement test. This provision guarantees that eligible social security beneficiaries over age 70 will receive their benefits notwithstanding continued gainful employment. Surely the protections of the federal statute are thwarted when the federal government puts money in the plaintiffs' left pocket while Wisconsin takes a precisely equal amount of money from their right pocket *solely because* the money was received through the social se-

---

**12.** We do not believe that plaintiffs here have lost the protection of the federal statute because their state salary (not including county supplements) amounts to the relatively large sum of $49,176 per year. *See Wis.Stat.* § 20.-923(2) (1979); 1981–82 *Wis. Blue Book* 599. Although Congress did note that most persons who would benefit from a limitation of the retirement test probably earn only small amounts of income, *see* S.Rep.No. 1669, 81st Cong., 2d Sess., *reprinted in* 1950 U.S.Code Cong. & Ad.News 3318, Congress did not enact any salary limitation to apply to individuals like plaintiffs. The elimination of the retirement test at age 70 is effective without regard to the salary level of the recipient. *Cf.* Chicago Tribune, April 30, 1982, at A–2 (President and some members of Congress over age 70 currently receive their full federal salary plus full social security benefit). In the absence of any exclusions or limitations in section 203(f)(3) based upon the amount of earned income, we cannot conclude that Congress would deny plaintiffs the protections of this statute.

**13.** Focusing on legislative history . . . often introduces ambiguities into the process of deciding preemption cases. As Justice Jackson observed, "[i]t is a poor cause that cannot find some plausible support in legislative history."
Note, 88 *Yale L.J.* 363, 384 (1978) (quoting Jackson, *The Meaning of Statutes: What Congress Says or What the Court Says,* 34 A.B.A.J. 534, 538 (1948) (footnote omitted).

curity program. *Cf. Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971) (state statute denying AFDC benefits to persons 18 through 20 years old attending college impermissibly conflicts with SSA provision defining eligible recipients as including dependents age 18 to 20 years attending college); *Nash v. Florida Industrial Commission,* 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967) (state statute denying unemployment benefits to persons who filed charges with NLRB impermissibly conflicts with federal statute designed to protect employees utilizing NLRB processes); *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962) (state statute denying rights of survivorship to persons purchasing federal bond with "community" assets impermissibly conflicts with federal regulation designed to allow co-ownership of bonds with rights of survivorship).

Further, in *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), the Court struck down a California statute which made no allowance for weight loss resulting from moisture loss occurring in the distribution of consumer goods. The provisions of the state statute conflicted with federal statutes regulating the labeling of meats and like goods. By failing to make allowance for moisture losses, the California statute clearly contradicted the Federal Meat Inspection Act, which both permitted variations resulting from moisture loss from the weight stated on a package of bacon and also provided that "different" labeling standards would not be allowed. 430 U.S. at 528–32, 97 S.Ct. at 1311–1313.

More significant for the instant case was the Court's conclusion in *Jones* that the California statute conflicted with the federal Fair Packaging and Labeling Act (FPLA), as applied to packages of flour. Although the FPLA expressly preempts, *inter alia,* "less stringent" state statutes regulating package labeling, 15 U.S.C. § 1461

(1976), the Court found that the California statute was not less stringent and thus was not *expressly* preempted. 430 U.S. at 538–39, 97 S.Ct. at 1316. Nevertheless, the Court concluded that the California statute must fall because the statute, as applied, stood as an "obstacle" to achieving the purposes of the federal law. Packages of flour, each containing the same amount of flour solids, might not satisfy both the federal and California labeling requirements. The Court reasoned that this discrepancy would inhibit value comparisons by consumers because, even though a package of flour marketed in California would state on the label the same gross weight as a package marketed in states following federal guidelines, millers marketing flour in California would need to add more flour to account for moisture losses. 430 U.S. at 540–43, 97 S.Ct. at 1317–1318.

In the instant case, the Wisconsin statute, although not expressly preempted, similarly frustrates the design of section 203(f)(3) of the SSA by setting off against the plaintiffs' salaries an amount exactly equal to their federal social security benefits. Without such a statutory provision, plaintiffs undeniably would, in accordance with federal policy, receive larger incomes upon attainment of age 70. They would receive full social security benefits regardless of their other earned income. We believe that a state statute which is applied to "cancel out" the receipt of a protected federal benefit, as in the instant case, clearly stands as an obstacle to frustrate the quite apparent underlying goals of the federal statute.

## III.

We therefore hold that *Wis.Stat.* § 753.-075 (1979), to the extent it deducts from the salaries of reserve judges amounts equivalent to their federal social security benefits, is void as violative of the supremacy clause.[14] The judgment of the district court is reversed and the case is remanded for the entry of an order directing defendants to

---

**14.** Because we dispose of this case on grounds that the Wisconsin statute violates the supremacy clause, we need not reach plaintiffs'

other asserted grounds for invalidating that statute.

pay to plaintiffs the sums that have been impermissibly deducted from their salaries on account of their receipt of social security benefits.

REVERSED.